**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

```
----------------------------------------------------------------x
                                                                :
KROLL, LLC,                                                     :
                                                                :
                              Plaintiff,                        :
                                                                :     Civil Action No. 1:24-cv-1389
          - against -                                           :
                                                                :
BENEDETTO DEMONTE and DEVON                                     :
ACKERMAN,                                                       :
                                                                :
                              Defendants.                       :
                                                                :
----------------------------------------------------------------x
```

## COMPLAINT

Plaintiff, Kroll, LLC ("Kroll," the "Company" or "Plaintiff"), by and through its undersigned attorneys, as and for its Complaint against Defendants, Benedetto Demonte ("Demonte") and Devon Ackerman ("Ackerman" and together with Demonte, the "Defendants"), alleges as follows:

## INTRODUCTION

1.      Kroll, a globally renowned provider of risk and financial advisory services, brings this action for damages and injunctive relief against two of its former executives arising from various acts of misconduct, including violations of their post-termination contractual obligations to Kroll, threatened misuse of Kroll's confidential information and trade secrets, and wrongful interference with Kroll's business relations and employees.

2.      Defendants are each former senior executives of Kroll's Cyber Risk division, which, among other services, provides digital forensics and incident response ("DFIR") services and solutions with respect to cyberattacks, data breaches, intelligence threats, and forensic investigations for thousands of clients around the world.

3.      Although Demonte and Ackerman each executed agreements containing restrictions against the unauthorized use of confidential information, competition, and solicitation of customers and employees, they, along with two other senior executives within the Cyber Risk team, Grant Duncan ("Duncan") and Jim Leonard ("Leonard" and together with Demonte, Ackerman and Duncan, the "Former Executives"),[1] each resigned from Kroll around the same time (three of them within a span of 24 hours) and are now widely reported to have joined a direct competitor of Kroll.

4.      Specifically, on July 9, 2024, it was reported in *Cyber Risk Insurer* that Ackerman, Demonte, and Leonard, among others, had recently resigned from Kroll "and are expected to reemerge at a rival firm in the coming weeks." The publication of the article in the wake of their resignations was, upon information and belief, part of a concerted campaign by Defendants and their new employer, which Kroll has since learned is Cybereason, Inc. ("Cybereason"), to steer clients away from Kroll, and indeed has already destabilized Kroll's business relations. Upon information and belief, the Former Executives' efforts to divert business away from Kroll began while they were still employed by Kroll given that in the weeks prior to their resignations, key clients of Kroll suddenly began to cease sending business to Kroll.

5.      Upon information and belief, the Former Executives, in concert with one another, have also been spreading false rumors about Kroll in an effort to further poison Kroll's business relations in the industry. Indeed, Kroll has learned from its clients and other industry contacts that the Former Executives have been spreading a false narrative that they were fired from Kroll and that "Kroll is out of the industry." Both of these statements are categorically false.

---

[1] Concurrently with this action, Kroll has also filed separate lawsuits against Duncan in the Supreme Court of the State of New York, County of New York and Leonard in the U.S. District Court for the Middle District of Tennessee for violation of their respective contractual post-termination obligations to Kroll.

6.      Upon information and belief, the Former Executives are also in the process of orchestrating a mass exodus of other Kroll employees, which started while they were still employed by Kroll. Not only did they conspire with and solicit each other to leave Kroll together, in violation of their contractual and fiduciary obligations to Kroll, but the July 9, 2024 article stated that according to its sources "there are likely other Kroll DFIR executives who have either already exited the company or are planning to."

7.      Since the publication of the article, certain employees of Kroll have confided that they received communications from at least one of the Former Executives who, upon information and belief are acting in concert, about leaving Kroll. Kroll presently continues to obtain information that other employees are being contacted by the Former Executives or someone on their behalf, about joining their organization. One such employee resigned on August 1, 2024, advised that she had accepted employment with Cybereason, and admitted that she was recruited by Leonard to join Cybereason while Leonard was still employed at Kroll.

8.      Further evidencing their nefarious intentions, three of the four Former Executives intentionally destroyed data on Kroll property on their way out the door. Demonte factory-reset his Company-issued phone and tablet, thus failing to preserve text messages and other data contained therein. Ackerman also factory-reset his Company-issued tablet and Leonard factory-reset his Company-issued phone as well. Their actions blatantly disregarded express instructions at the time of their departure to "not wipe any company information or data from your phone, laptop, or other electronic devices," in addition to Kroll corporate policy, multiple active litigation hold notices in relation to other ongoing matters, and their contractual agreements with Kroll.

9.      Given their years of experience as leaders in the cyber security industry, Defendants are fully aware of the critical importance and need to safeguard and preserve Company data, but nevertheless knowingly destroyed Company data in an effort to cover their tracks, including any

text messages evidencing their duplicitous conduct and showing whether confidential Kroll files or trade secrets were exchanged using those devices.

10.     Defendants' overarching plan is clear — to burn the house down on their way out of Kroll, steer Kroll's clients and employees to a "rival firm" by poisoning those relationships against Kroll, and eventually replicate Kroll's business at Cybereason.

11.     Their unlawful actions, among others, knowingly and intentionally perpetrated, have caused both serious monetary injury and irreparable harm to Kroll.

12.     Absent injunctive relief, Kroll faces irreparable injury, including the loss of customers, its competitive advantage, its trade secrets and goodwill in amounts which may be impossible to determine unless Defendants are enjoined and restrained by order of this Court.

### THE PARTIES

13.     Plaintiff Kroll, LLC is a Delaware limited liability company with its principal place of business located in New York, New York.

14.     Upon information and belief, defendant Demonte is a citizen of the State of Pennsylvania and resides in Doylestown, Pennsylvania.

15.     Upon information and belief, defendant Ackerman is a citizen of the State of North Carolina and resides in Garner, North Carolina.

### JURISDICTION AND VENUE

16.     Plaintiff Kroll, LLC is a Delaware limited liability company with its principal place of business located in New York, New York. Kroll is wholly owned by its ultimate parent, Duff & Phelps Holdings Corporation, which is a Delaware corporation with its principal place of business located in New York, New York. Accordingly, for diversity purposes, Kroll is considered a citizen of the States of Delaware and New York

17.     This Court has personal jurisdiction over Demonte and Ackerman by reason of their execution of a Confidential-Non-Solicitation and Proprietary Rights Agreement for US Employees (the "CNPR") with Kroll, in which they each consented to the exclusive jurisdiction of the state and federal courts located in or having jurisdiction over Fairfax County, Virginia.

18.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(3) because the CNPR contains an exclusive venue clause that states "exclusive venue and forum for any legal action arising from this Agreement is a court of competent jurisdiction at Virginia."

## ALLEGATIONS COMMON TO ALL COUNTS

### I.     Overview of Kroll's Cyber Risk Business

19.     Kroll is a global provider of services and digital products related to valuation, governance, corporate intelligence and investigations, corporate finance, restructuring, financial advice, compliance, and cyber risks for private and public sector clients.

20.     Kroll is divided into several main business segments, including its Cyber Risk division. The Cyber Risk division provides a variety of cutting-edge services relating to managing cyber threats, including 24-7 incident responses, Business Email Compromise ("BEC") response and investigation, managed care services and security monitoring through its Kroll Responder managed detection and response ("MDR") platform to guard against cyberthreats and ransomware, threat assessments, and computer forensics, among other services.

### II.     Kroll's Protected Interests

#### *Referral relationships*

21.     Although Kroll's Cyber Risk division services thousands of customers around the world, these customers are most typically sourced from a network of major law firms and insurance carriers who refer victims of cyberattacks to Kroll. These referrals routinely then become

established long term customers of Kroll who rely upon Kroll to provide managed care services, be at the ready to immediately respond to cyber threats, and protect their data.

22.     The cyber risk and DFIR industry is highly competitive.  In addition to traditional marketing methods, in order to generate and sustain business, Kroll invests considerable resources cultivating relationships with law firms and insurance carriers in order to maintain their position on a panel of a select few cybersecurity experts to whom these law firms and carriers will refer their clients and insureds. Pricing of work is separately negotiated with these referral sources based upon a number of competitive factors including Kroll's use of highly proprietary technologies, and is considered highly confidential to Kroll. Kroll also invests significant resources expanding its relationships with the end-customer, which range from small businesses to Fortune 500 companies.

23.     Maintaining customer relationships and generating repeat business from referral sources based on its reputation are thus critical to Kroll's success because long-term business relationships with established customers and referral sources allow Kroll to maintain its competitive advantage and strategic position in the industry.

### *Quality customer service and goodwill*

24.     Because Kroll's business is service oriented, the relationships that Kroll has with its customers are highly dependent on the attention and service, as well as Kroll's use of state-of-the-art technology, which Kroll gives to them on an ongoing basis. Investing in customer service enables those who deal with Kroll to develop confidence in the quality of the services offered, and in increased recognition of, and familiarity with, Kroll as a provider of quality services.

25.     Furthermore, because customers also entrust the protection of their business and their confidential information to Kroll, an essential aspect of the Company's business model is to protect its reputation and goodwill. Customer goodwill is particularly critical in this industry

because any compromise of a customer's digital infrastructure could seriously damage its business operations and Kroll's reputation.

26.    Kroll's executives and sales representatives, including the Former Executives, who interface directly with existing and potential customers, not only are the face of the Company, but they benefit directly and indirectly from the goodwill, reputation, and name recognition generated by Kroll's investments in customer service and proprietary technology and consequently are able to forge relationships and cultivate accounts on behalf of Kroll.

*Customer pricing and historical data*

27.    Given that the Company's success and reputation in the market is also a function of competitive pricing, the Company treats pricing, customer and vendor contracts, profit and loss analysis, bid proposals, research and development into new technologies, sales and growth strategies, employee compensation data, and other similarly sensitive information as confidential and trade secret information.

28.    To effectively service Kroll's customers, the Company also compiles data and reports pertaining to its customers spanning many years. Such customer information includes data reflecting all work done on behalf of particular customers, pricing arrangements, and the identities of individual points of contact and so-called "breach coaches" among referral sources, and sales opportunities and trends.

### III.    Risk to Kroll and Steps to Protect

29.    The foregoing compilation of information is treated as highly confidential and trade secret information by the Company because it would provide a competitor with a "playbook" into how to approach each referral source and customer and usurp its business from Kroll. Such information could also be used to undercut pricing and evaluate service opportunities.

30.     Kroll has spent a substantial amount of time and money in developing and acquiring all of the foregoing confidential information, to which the Company's trusted senior executives have access to enable them to cultivate customer relationships and expand the business on the Company's behalf.

31.     The foregoing confidential, proprietary and/or trade secret information is not generally known to the public.

32.     The foregoing confidential, proprietary and/or trade secret information would give a competitor who acquired it an unfair competitive advantage by, among other things: (a) not having to invest the time and resources to develop the customer relationships or information as the Company has done; and (b) allowing the competitor to unfairly compete by, among other things, leveraging their access to or knowledge of such information, including pricing and the aforementioned customer information.

33.     The Company takes the protection of its trade secrets and confidential information very seriously. Not only is all such data stored on password-protected servers requiring multi-factor authorization, but every Kroll employee is required at the outset of employment, where permitted by applicable law, to execute agreements with non-disclosure and other post-employment protective covenants. Employees are also required to preserve all Company data and, upon termination of employment, to return all Company property, including any Company files and records in their possession.

34.     The Company also subjects all of its employees to various written policies, including an Acceptable Use of Assets Policy, a copy of which is attached hereto as Exhibit A. That policy expressly provides that all data, files, communications, and messages on any Company-issued devices, including text messages on those devices, are the property of Kroll, and that any unauthorized use, removal, damage, or alteration of such files violates Kroll policy.

## IV.    The Former Executives' Employment with Kroll

### *Demonte*

35.    Demonte became employed by Kroll in or around November 2012 as Director – Cyber Investigations. Prior to Kroll, Demonte served as a digital forensic examiner for the Federal Bureau of Investigation ("FBI").

36.    Upon information and belief, Demonte had no prior experience working on behalf of private industry clients in the Cyber Risk space or providing consulting services of the type offered by Kroll and did not join Kroll with any "book of business" or clients. Accordingly, his success at Kroll was dependent in large part on his ability to use the Kroll platform, reputation, goodwill and resources to expand and service Kroll's existing client relationships and to develop new ones.

37.    During his tenure with Kroll, Demonte's responsibilities expanded as he was elevated to more senior positions. At the time of his resignation from the Company, effective June 28, 2024, Demonte was serving as Chief Operating Officer, Cyber with an annual compensation of approximately $468,000, exclusive of bonuses and commissions.

38.    As Chief Operating Officer, Cyber, Demonte had overall responsibility for the global operations and performance of the Cyber Risk division. In this regard, Demonte had access to all aspects of the Cyber Risk division's confidential and trade secret information, including its financial metrics, profit and loss analysis, pricing, customer information, customer contracts, Kroll's use of proprietary technology, and sales and growth strategies. He also had knowledge of and access to confidential information concerning Kroll's employees, including their wage and compensation information.

39.    In addition to his salary, Kroll invested incalculable dollars and resources providing Demonte with a platform for career success, including enabling access to networking opportunities

with existing and potential clients, speaking engagements, industry conferences, and cutting-edge advancements in the industry.

40.     At the time of his resignation, Demonte was primarily working remotely from his home in Pennsylvania, but was considered an employee of Kroll's office in Secaucus, New Jersey.

*Ackerman*

41.     Ackerman became employed by Kroll in or around May 2016 as Senior Director. Prior to Kroll, Ackerman served as a special agent and digital forensics sciences examiner for the FBI.

42.     Upon information and belief, Ackerman had no prior experience working on behalf of private industry clients in the Cyber Risk space or providing consulting services of the type offered by Kroll and did not join Kroll with any "book of business" or clients. Accordingly, his success at Kroll was dependent in large part on his ability to use the Kroll platform, reputation, goodwill and resources to expand and service Kroll's existing client relationships and to develop new ones.

43.     During his tenure with Kroll, Ackerman's responsibilities expanded as he was elevated to more senior positions. At the time of his resignation from the Company, effective July 15, 2024, Ackerman was serving as Global Service Line Leader, DFIR at Kroll, with an annual compensation of approximately $450,000.00, exclusive of bonuses and commissions.

44.     As Global Service Line Leader, Ackerman had responsibility over Kroll's operational performance and execution strategies for Kroll's Cyber Risk customers. He had extensive interactions with Kroll's customers and vendors, and was expected to cultivate business relations on behalf of the Company.

45.     Ackerman also had extensive access to confidential and trade secret information concerning its financial metrics, profit and loss analysis, pricing, customer information, customer

contracts, Kroll's use of proprietary technology, sales and growth strategies, and information regarding Kroll employees.

46.     In addition to his salary, Kroll invested incalculable dollars and resources providing Ackerman with a platform for career success, including enabling access to networking opportunities with existing and potential clients, speaking engagements, industry conferences, and cutting-edge advancements in the industry.

47.     At the time of his resignation, Ackerman was primarily working remotely from his home in North Carolina, but was considered an employee of Kroll's New York City office.

*Duncan*

48.     Duncan became employed by Kroll in or around January 2012. Upon information and belief, prior to Kroll, Duncan had no prior experience working on behalf of private industry clients in the Cyber Risk space or providing consulting services of the type offered by Kroll and did not join Kroll with any "book of business" or clients. As such, his success at Kroll was dependent in large part on his ability to use the Kroll platform, reputation, goodwill and resources to expand and service Kroll's existing client relationships and to develop new ones.

49.     During his tenure with Kroll, Duncan's responsibilities expanded as he was elevated to more senior positions. At the time of his resignation from the Company, effective July 12, 2024, Duncan was serving as Global Head of Sales, Managing Director, Cyber at Kroll, with an annual compensation of $329,160.00, exclusive of bonuses and commissions. Notably, Duncan received commissions in excess of $690,000 each year in 2022 and 2023.

50.     As Global Head of Sales, Duncan bore ultimate responsibility over revenue generation and developing partnerships with customers and other business relations within Cyber Risk. Duncan routinely interacted with customers, either directly or through a team of managing directors and associates who reported up to him, one of whom was Jim Leonard. Like Demonte

and Ackerman, Duncan also had extensive access to confidential and trade secret information concerning its financial metrics and performance, pricing, customer information, use of proprietary technology, sales and growth strategies, and information regarding Kroll employees.

51.     In addition to his salary, Kroll invested incalculable dollars and resources providing Duncan with a platform for career success, including enabling access to networking opportunities with existing and potential clients, speaking engagements, industry conferences, and cutting-edge advancements in the industry.

52.     At the time of his resignation, Duncan was primarily working remotely from his home in New York, but was considered an employee of Kroll's New York office.

*Leonard*

53.     Leonard was previously employed by Kroll between 2005 and 2011. In 2018, Leonard rejoined Kroll as Vice President, Cyber Risk.

54.     During his tenure with Kroll, Leonard's responsibilities expanded as he was elevated to more senior positions. At the time of his resignation from the Company, effective June 28, 2024, Leonard was serving as Associate Managing Director, with an annual compensation of approximately $400,000, exclusive of bonuses and commissions.

55.     In that role, Leonard had overall responsibility over the Company's partnership with its key insurance carrier clients and managing those relationships. As such, Leonard also had access to a wide range of confidential and trade secret information, including financial metrics, profit and loss analysis, pricing, customer information, customer contracts, Kroll's use of proprietary technology, and sales and growth strategies.

56.     In addition to his salary, Kroll invested incalculable dollars and resources providing Leonard with a platform for career success, including enabling access to networking opportunities

with existing and potential clients, speaking engagements, industry conferences, and cutting-edge advancements in the industry.

57.     At the time of his resignation, Leonard was primarily working remotely from his home in Tennessee.

## V.     The Former Executives' Agreements with Kroll

58.     As a condition of their employment with Kroll, Demonte and Ackerman each executed agreements containing confidentiality obligations and restrictive covenants designed to protect Kroll's confidential information, clients and employees for a limited period following their departure from the Company, as set forth in the CNPR.

59.     Demonte executed the CNPR at the outset of his employment on October 10, 2012, a copy of which is attached hereto as Exhibit B.

60.     Ackerman executed the CNPR at the outset of his employment on March 16, 2016, a copy of which is attached hereto as Exhibit C.

61.     Each CNPR contains a provision prohibiting any unauthorized use or disclosure of Kroll's "Company Records" and "Confidential information" (the "Non-Disclosure Covenant"). The Non-Disclosure Covenant expressly provides, in relevant part, as follows:

Nondisclosure

a.  You agree not to engage in any unauthorized use or disclosure of Confidential Information. You agree to preserve all Company Records and not to use any Company Records in any way, directly or indirectly, to harm the Company. You will not use Confidential Information or Company Records for any purpose without the prior written authorization of a Company officer, except that you may use Confidential Information and Company Records to perform your duties….

b.  Your use of Confidential Information and Company Records shall cease immediately upon termination of your employment. You will return all Confidential Information, Company Records, and other Company property to Company upon termination of employment (or earlier if so requested), and will not retain any such material or information except where expressly authorized in writing. You will permit the Company to inspect any materials

to be removed from the Company's offices when your employment terminates. You understand that you have no reasonable expectation of privacy with respect to materials and belongings that you bring onto Company premises.

*See* CNPR § 3.

62.     The CNPR defines "Company Record" as "any document or file, whether hard copy or electronic, concerning the Company's business and affairs."

63.     "Confidential Information" is broadly defined in the CNPR as:

Information or a compilation of information, in any form (tangible or intangible), related to the Company's that has not appropriately been made public and that is not generally known to the public or to other persons who might obtain value or competitive advantage from its disclosure or use. Confidential Information includes, but is not limited to, the Company's business plans and analysis; financial information; pricing information; training information and programs; customer and prospective customer lists and contact information; customer buying histories, requirements, preferences, and specifications; vendor information and vendor history; referral source information; marketing plans, strategies and promotions; research and development data; buying practices; supplier information; employee data, organizational information, internal business methods and techniques; technical data, know-how, innovations, computer programs, un-patented inventions, and trade secrets; and information about the business affairs of third parties (including, but not limited to, customers, vendors and suppliers) that such third parties provide to the Company in confidence. Information that is intentionally disclosed or authorized for disclosure to the general public by Company is not considered Confidential Information. You acknowledge that items of Confidential Information are Company assets and have economic value because they are not generally known by the public or others who could use them to their own economic benefit and/or to the competitive disadvantage of the Company, and thus, should be treated as trade secrets.

CNPR § 2.

64.     The restrictions on disclosure of confidential information apply for three (3) years following the termination of each Defendant's employment for information that does not qualify as a trade secret and apply indefinitely for trade secret information.

65.    To further protect Kroll's confidential information, client relationships and employees, each CNPR also contains a section entitled "Protective Covenants," which states, in relevant part:

> During the twelve (12) month period immediately following the end of you employment with Company, you will not:
>
> a)  interfere with the Company's relationships with its employees, by: (i) soliciting or communicating with an employee to induce or encourage him or her to leave Company's employ (regardless of who first initiates the communication); (ii) otherwise helping any person or entity hire an employee away from Company; or (iii) hiring an employee to work elsewhere [the "Employee Non-Solicitation Covenant"].
>
> b)  interfere with Company's business relationships with a Covered Customer, by soliciting or communicating (regardless of who initiates the communication) with a Covered Customer to induce or encourage the Covered Customer to: (i) stop or reduce doing business with Company, or (ii) to buy a Competing Product or Service. The parties agree this restriction is inherently reasonable because it is limited to the locations where the Covered Customer does business [the "Client Non-Solicitation Covenant"]; or
>
> c)  participate in, supervise, or manage (as an employee, consultant, contractor, officer, owner, director, or otherwise) Competing Activities in the Restricted Area [the "Non-Competition Covenant"].

CNPR § 5.

66.    Pursuant to the CNPR, the terms "Covered Customer," "Competing Product or Service, and "Competing Activities" are defined as follows:

- A "Covered Customer" is "a Company customer as to which you received Confidential Information or had business dealings in the [one (1) year prior to the end of your employment with the Company], but excludes any entity who ceased being a customer at least six (6) months prior to your termination (due to no fault of you)."

- A "Competing Product or Service" is "a product and/or service, such that it would replace or compete with: a product and/or service Company provides to its customers; or a product or service that is under development or planning by Company but not yet provided to customers and regarding which you were provided Confidential Information. Competing products or Services do not include a product or service of the Company if the Company no longer

provides such product or service to its customers at the relevant time of enforcement."

- "Competing Activities" are "any activities or services undertaken on behalf of a person or entity engaged in providing a Competing Product or Service that are the same or similar in function or purpose to those you performed in [the period one (1) year prior to the end of your employment with the Company]. Competing Activities do not include: (i) activities on behalf of an independently operated business unit of a larger business that has division(s) that provide a Competing Product or Service so long as the business unit to whom you are providing services does not provide a Competing Product or Service; or (ii) a passive and non-controlling ownership interest in less than 2% of the stock in a publicly traded company."

CNPR § 2.

67.     The "Restricted Area" under the CNPR is the United States, and for executives with confidential information pertaining to Kroll's international operations—to which Demonte and Ackerman was each given access—the Restricted Area also includes Europe, Latin America and Asia, and any additional countries and territories where the Company markets its products and services over the twelve (12) months prior to separation of employment. In the CNPR, Demonte and Ackerman each expressly agreed that "[t]his is a reasonable geographic area because you are expected to help Company provide its products and services and create, receive and analyze Confidential Information pertaining to such products and services throughout the Restricted Area." CNPR § 2.

68.     The CNPR contains a choice of law provision that provides that "the laws of the state where you regularly and primarily work for the Company shall apply." CNPR § 7(h).

69.     Leonard and Ackerman had also executed agreements at the outset of their employment with Kroll that contain post-employment restrictive covenants as a condition of their employment with Kroll and access to Kroll's confidential information and trade secrets.

70.     Duncan's agreement with Kroll (the "Duncan Agreement") includes a limited post-termination restriction not to compete with Kroll for twelve (12) months after leaving Kroll, and an eighteen (18) month restriction against the solicitation of Kroll clients and employees.

71.     Leonard's agreement with Kroll (the "Leonard Agreement")[2] includes a limited post-termination restriction not to solicit Kroll clients and employees for a period of two (2) years after leaving Kroll.

72.     As sophisticated experts in the field of cyber security and data protection, each of the Defendants indisputably understood the vital importance of the Company's non-disclosure restrictions and protective covenants. Indeed, Demonte and Ackerman each expressly agreed that the restrictive covenants in the CNPR are "reasonable and necessary to protect the Company's legitimate business interests, including the protection of the Company's trade secrets, not against the public interest, and do not impinge on [his] ability to earn a living." CNPR § 5.

73.     In addition, to the CNPR, Demonte and Ackerman each also executed separate agreements with Kroll in connection with their receipt of certain restricted equity and stock options. These agreements include the Delta Parent Holdings, Inc. 2020 Equity Incentive Plan Nonqualified Stock Option Agreement; the Delta Parent Holdings, Inc. 2020 Equity Incentive Plan Restricted Stock Unit Agreement; the Delta Parent Holdings, Inc. 2020 Equity Incentive Plan Convertible Preferred Restricted Stock Unit Agreement; and the Delta Parent Holdings, Inc. 2021 Incentive Plan Nonqualified Stock Option Agreement.

74.     In each of these equity agreements, Demonte and Ackerman each expressly reaffirmed their agreement to be bound by the restrictive covenants in the CNPR. As set forth in

---

[2] The CNPR, Duncan Agreement, and Leonard Agreement shall collectively be referred to hereinafter as the "Kroll Employment Agreements."

those agreements, their receipt of benefits under those agreements is expressly conditioned upon their continued compliance with the terms of the CNPR.

**VI.**    **Defendants' Resignations and Kroll's Discovery of Their Unlawful Conduct**

*The Former Executives' Simultaneous Resignations*

75.    In or around April 2024, Demonte began to express a purported frustration about certain managerial changes within Kroll.

76.    Brent Tomlinson, the Co-President of Risk Advisory at Kroll, met with Demonte to address his concerns.

77.    During their discussions, Tomlinson made it clear to Demonte that he was considered a valued employee of Kroll. Tomlinson also offered alternative roles for Demonte, expressly made it clear to him that his title, compensation, and seniority would not change, that he remained important to the business, and that his areas of focus as an operator would evolve with the business and be more operationally focused.

78.    Demonte rejected those overtures and expressed his desire to separate from Kroll. Tomlinson made it clear to Demonte that he was not being terminated and would only explore separation if Demonte wished to resign. Demonte reiterated his desire to resign, and Kroll accepted Demonte's resignation.

79.    Out of respect for Demonte's time with the organization, in June 2024, Tomlinson, on behalf of Kroll, agreed to negotiate a separation package with Demonte.

80.    During these negotiations, Demonte claimed to Tomlinson that he did not have any employment prospects, would not be able to work for at least six months, and needed to support his family.

81.    In reliance on Demonte's repeated representation that he would not be working for some time, Kroll, accordingly, agreed to a separation package that would have included certain

18

severance benefits and a modified waiver of the Non-Competition Restriction conditioned upon Demonte's compliance with his obligations to Kroll and the separation terms.

82.      Demonte formally resigned on June 17, 2024 and his last day with Kroll was June 28, 2024.

83.      Unbeknownst to Kroll at the time that his separation package was being negotiated, and contrary to his direct and numerous representations otherwise, Demonte was, upon information and belief, scheming to join a direct competitor and was in discussions with Ackerman, Duncan, and Leonard, all longtime colleagues of Demonte at Kroll and in previous organizations, about leaving Kroll and working together elsewhere, with the goal of moving all of Kroll's DFIR business.

84.      The near simultaneous departures of the Former Executives supports this belief. Indeed, less than a week after Demonte's departure, Ackerman and Leonard both tendered resignation notices on July 2, 2024. The next day, July 3, 2024, Duncan tendered his notice of resignation.

85.      Duncan's last day with Kroll was July 12, 2024.

86.      Ackerman's last day with Kroll was July 15, 2024.

87.      Leonard's last day with Kroll was July 16, 2024.

88.      In the midst of these resignations, on July 9, 2024, an article was released in an industry publication, *Cyber Risk Insurer*, with the headline, "*Kroll DFIR leadership team exits, including Leonard, Ackerman, and Demonte*" (the "Press Release"). In the initial version of the Press Release, a copy of which is attached hereto as Exhibit D, the author states that "Kroll's senior leadership team within its digital forensics and incident response (DFIR) unit have left the company – including Jim Leonard, Devon Ackerman, and Ben Demonte – and are expected to reemerge at a rival firm in the coming weeks."

89.     Just two days later, Demonte informed Kroll that he intended to begin employment at a new company beginning on August 12, 2024.

90.     Based upon the foregoing chronology and factual circumstances, Kroll has reason to believe that Demonte lied about his intentions to Tomlinson, and was already secretly planning to compete with Kroll at the time that the separation package was being negotiated. As the ring leader of the group and aided by Cybereason, Kroll also has reason to believe that Demonte solicited Ackerman, Duncan, and Leonard to join his new employer.

91.     Following their notices of resignation, none of the Former Executives would say to Kroll where they would be working next, despite repeated requests from various leaders within Kroll and Kroll's HR personnel.

92.     Kroll subsequently learned through industry chatter and from its own employees that the Former Executives moved as a group to Cybereason and intend to provide competing services on behalf of Cybereason.

93.     According to its website, Cybereason provides DFIR services in direct competition with Kroll.

*The Former Executives' Failure to Return and Intentional Destruction of Company Data*

94.     As set forth above, pursuant to Kroll policy and the CNPR, upon resignation, Demonte and Ackerman were required to immediately return all Company property and Company Records in their possession, including Company-issued computer devices, tablets, and phones without damage or alteration.

95.     Demonte returned his Company-issued laptop, tablet, and phone on July 1, 2024, after he negotiated the terms of his separation and agreed to return all Kroll property, records and communications. Upon receiving the devices from Demonte, Kroll discovered that Demonte had

factory-reset his Company-issued phone and tablet, effectively "wiping" and rendering unrecoverable all text and instant messages contained therein.

96.     Ackerman returned his Company-issued laptop and tablet on July 17, 2024. Upon receiving those devices, Kroll discovered that he had factory-reset his Company-issued tablet.

97.     Despite their obligation to do so, Leonard and Duncan failed to immediately return their Company-issued devices. Instead they waited at least two weeks and only after being notified that Kroll had filed suit against them before returning them to Kroll. In the meantime, Leonard and Duncan continued to be in possession of Kroll's confidential, proprietary and trade secret information contained on those devices after they left Kroll and began working for Cybereason.

98.     When Kroll received Duncan's and Leonard's Company-issued devices. Kroll discovered that Leonard had also factory-reset his phone in violation of his preservation obligations.

99.     Demonte, Ackerman, and Leonard each factory-reset Company-issued devices despite receiving express instructions when offboarding to "not wipe any company information or data from your phone, laptop, or other electronic devices." Those instructions also explicitly state as follows:

> Confidential Information & Company Property
> - All physical and electronic Kroll property and records in your possession or control must be returned to the IT department on your last day. All company and client information remains confidential even after you leave the Company.
> - You should not wipe any company information or data from your phone, laptop, or other electronic devices. Personal files saved on the Company phone or laptop will not be retrievable once returned.
> - Cyber Risk employees are not permitted to port out of Kroll Cyber issued mobile numbers.

Copies of Demonte's and Ackerman's offboarding instructions from Human Resources are attached hereto as Exhibits E and F.

100.    Furthermore, per Company policy, as set forth above, all of those messages constitute Company Records and Kroll property, given they were exchanged using Company-issued devices.

101.    As executive leaders within Kroll's Cyber Risk division, the Former Executives are each aware of the Company's strict policy regarding the treatment of Company data, the need to protect such information from misuse and destruction, and the unlawfulness of their actions should they take any affirmative steps to remove, tamper with, or destroy such data.

102.    As experts within the digital forensic industry, the Former Executives each know that factory-resetting their phones and tablets would render unrecoverable certain data contained therein, including text messages.

103.    In addition to violating Company policy, the failure to preserve data on their Company-issued devices also violates multiple ongoing litigation hold notices to which the Former Executives were subject, which expressly instruct them to preserve and not to destroy any emails, voice mails, and text messages, among other documents and communications.

104.    Upon information and belief, the Former Executives engaged in the foregoing acts of spoliation and/or delayed returning their Company-issued devices as part of a concerted plan to thwart Kroll's ability to find evidence of their misconduct.

## VII.    The Former Executives' Violation of the Protective Covenants in the CNPR

### *Promoting and participating in competing activities*

105.    As set forth above, on July 9, 2024, while Ackerman, Duncan and Leonard were still employed by Kroll, the Press Release reported that Demonte, Ackerman and Leonard left Kroll and are expected to join "a rival firm in the coming weeks."

106.    Kroll contacted the publisher of the Press Release but the author refused to disclose his sources.

107.    While the source of the Press Release is currently unknown to Kroll, only the Former Executives and Cybereason would stand to benefit from publicizing their departure from Kroll, namely drawing Kroll's referral and client base to Cybereason. At that time, only a handful of senior leaders within Kroll were aware of the Former Executives' plan to leave Kroll as they were instructed not to speak to others within Kroll until a communications plan was developed.

108.    Upon information and belief, the timing of the Press Release was intended to destabilize Kroll's business relationships to make it easier for Defendants to steer their business away from Kroll once they are up and running. Indeed, it is already having an adverse impact on Kroll's business with multiple referral channels and clients referencing the Press Release as a reason to pause providing work to Kroll at this point in time.

109.    Regardless of the Press Release's source and timing, Defendants' employment with Cybereason, a direct competitor of Kroll, violates the Non-Competition Covenant in the CNPR.

*Interfering with Kroll's employee relationships*

110.    The Press Release originally indicated that another Kroll employee, Kelly McManus, Senior Vice President, Cyber Risk, who reported directly up to Leonard and Duncan, was also departing Kroll. Based in the United Kingdom, McManus had key relationships with numerous clients and referral sources in Europe and was thus a major asset to Kroll.

111.    McManus initially denied the report that she had left Kroll and requested that the publisher remove her name from the article. The publisher did so, however, other than the reference to McManus, the publisher conveyed to Kroll that the remainder of the article was accurate with a high degree of confidence.

112.    When confronted by Kroll about the Press Release, McManus claimed that she did not know Defendants' intended destination. However, she admitted that she had a discussion with

Leonard about the article and that Leonard confided to McManus that he, Demonte and Ackerman would in fact be working together at another firm but purportedly would not say where.

113.    Despite claiming that she did not know where Defendants were headed and claiming that the statement with respect to her departure from Kroll was false, on July 22, 2024, McManus abruptly resigned from Kroll. Clearly the author of the Press Release was somehow made aware of McManus's impending departure.

114.    Upon information and belief, the Former Executives not only solicited each other to leave Kroll together, but have also been working in concert to solicit others to leave Kroll's employ in violation of the employee non-solicitation covenants in their respective Kroll Employment Agreements. Indeed, the Press Release further reported that "there are likely other Kroll DFIR executives who have either already exited the company or are planning to."

115.    In the days following their resignations, Kroll has learned from several of its employees that the Former Executives recently contacted them, attempting to encourage Kroll's current employees to leave Kroll's employ and claiming to at least one of employee he had no future with the Company. Such employees directly referenced conversations with the Defendants, disparaging Kroll, its leadership and encouraging other Kroll employees to reconsider their continued employment at Kroll, whether employment elsewhere is something that would be better for their careers,  and to "be on the lookout for where we go."

116.    Kroll has also recently learned that the Former Executives and/or Cybereason, working in concert with each other, had reached out to a number of employees in Kroll's DFIR team telling them that their new firm has "50 open slots" and that "Kroll does not have a plan."

117.    On August 1, 2024, Jasmine Hay, a Kroll employee within the Cyber Risk division who worked under Leonard, announced her resignation. When confronted, Hay confirmed that she had accepted employment with Cybereason and had been recruited by Leonard, presumably in

concert with or aided by the Defendants and Cybereason, while he was still employed with Kroll to join him at Cybereason.

118.     Defendants' aiding in the recruitment of Ms. Hay and their attempts to poach other Kroll employees or encourage them to leave Kroll, as set forth above, violates the Employee Non-Solicitation Covenant in the CNPR.

*Interfering with Kroll's customer relationships*

119.     Kroll also has reason to believe that Defendants violated the Client Non-Solicitation Covenants while they were still employed by Kroll. Indeed, upon information and belief, the Press Release was issued within the intent to destabilize Kroll's business relations in the industry, while Ackerman, Duncan, and Leonard were all still employed by Kroll, knowing they would be leaving and competing with Kroll shortly. Furthermore, around the same time as Demonte's resignation, certain insurance carrier clients with whom Leonard was primarily responsible for managing on behalf of Kroll abruptly ceased sending business to Kroll.

120.     In particular, prior to Demonte's resignation, certain law firms with whom the Former Executives have particularly strong relations have ceased sending referrals to Kroll. One such longstanding law firm client claimed it would no longer do business with Kroll purportedly because David Burg, Global Head of Cyber Risk at Kroll, had failed to meet with that firm during a recent industry conference. Upon information and belief, the Former Executives, who were responsible for setting up Mr. Burg's agenda at that conference, had intentionally not scheduled a meeting in an effort to undermine Kroll's relations with that client.

121.     Separately, Kroll had learned from another source in the industry that Ackerman had told another law firm client about his impending departure and that he intends to move all of Kroll's business from that firm.

122.    More recently, Kroll learned that Leonard is currently coordinating with clients and vendors regarding an annual event typically hosted by Kroll. Leonard, in concert with the Defendants and Cybereason, is actively attempting to displace Kroll as the host of the event, in a blatant effort to usurp Kroll's business relationships.

123.    Upon information and belief, the Former Executives have also been spreading misinformation and making disparaging statements about Kroll in furtherance of their effort to interfere with Kroll's business relations and move business away from Kroll. For example, Kroll learned from one of its carrier clients that there is a rumor circulating that Kroll is now unable to provide any malware or BEC services. That claim is categorically false.

124.    Kroll also recently heard from a contact at one of its law firm clients that he heard that Kroll is "out of the industry." That claim too is false. Upon information and belief, the Former Executives are the source of these rumors and misinformation.

125.    Kroll also has reason to believe that the Former Executives have been advising the industry that they had been fired from Kroll, which is also false.

126.    Defendants' interference with Kroll's customer relationships, disparaging comments about Kroll, and attempts to move business away from Kroll, as set forth above, violates the Client Non-Solicitation Covenant in the CNPR.

## V.    <u>The Irreparable Harm to Kroll</u>

127.    Due to Defendants' conduct, individually and/or in concert with the other Former Executives and Cybereason, as set forth above, Kroll stands to lose an incalculable amount of dollars in business, both internally, including for example, hiring and replacing the solicited employees while also restoring morale and stability across existing employees, and externally, such as the loss of value of goodwill and valuable relationships with its customers and referral sources, which cannot be addressed at law.

128.    Not only are Defendants believed to be in possession of Kroll's confidential information and trade secrets, but by engaging employment with a competing firm in violation of their agreement not to compete with Kroll during the one year period after separation of employment, and performing the exact same functions as they did for Kroll, Defendants will inevitably use or disclose Kroll's valuable trade secrets on behalf of their new employer.

129.    Defendants' conduct is particularly egregious in that they were each senior executives of the Cyber Risk business who understand the importance of protecting Company property and its data, but nevertheless destroyed, failed to preserve or return such data on their Company-issued devices before returning them to Kroll, in violation of Kroll's express policies. Such spoliated data would undoubtedly have included evidence of their misconduct, including Defendants' plans to join a competing company, the solicitation of Kroll's customers and employees, and use of Kroll's confidential information and trade secrets.

130.    Upon information and belief, Defendants, together with the other Former Executives and Cybereason, further intend to decimate Kroll's Cyber Risk business by recruiting other Kroll employees or encouraging them to leave Kroll's employ, and by spreading misinformation about Kroll's business.

131.    All told, Defendants are causing, threatening and/or will continue to cause or threaten significant irreparable harm to Kroll, as well as damage to Kroll's reputation as an industry leader.

132.    Money alone cannot make Kroll whole.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach and Anticipatory Breach of Contract)

133.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

134.    Demonte and Ackerman each entered into the CNPR during their employment with Kroll.

135.    The CNPR is a duly executed and enforceable contract as to Demonte and Ackerman, giving rise to legal obligations between each Defendant and Kroll, including the protective covenants contained therein, along with their obligation to return all Company Records upon termination of employment.

136.    The protective covenants in the CNPR remain in full force and effect and are supported by good consideration.

137.    The protective covenants in the CNPR are necessary and tailored to protect Kroll's legitimate business interests, including but not limited to Kroll's customer and employee relationships, goodwill, and confidential and proprietary business information.

138.    By the acts described above, Demonte and Ackerman each breached the CNPR, either individually or in concert with each other, by, *inter alia*, (1) actively soliciting Plaintiff's customers and inducing them to terminate their relationship with Kroll, or otherwise diverting business away from Kroll; (2) participating in a business that competes directly with Kroll and offering products and services in direct competition with Kroll; (3) soliciting and conspiring with each other, along with Duncan and Leonard, to join a direct competitor and recruiting other Kroll employees or encouraging them to leave Kroll's employ; and (4) destroying or failing to return Company Records upon cessation of employment with Kroll.

139.    To the extent either of the Defendants have not yet begun working in competition with Kroll, their disavowal of their contractual obligations under the CNPR by announcing their intention to work at Cybereason in direct competition with Kroll constitutes a further anticipatory breach of the CNPR.

140.     Upon information and belief, Defendants' breaches of the protective covenants continue to this day, and will continue unless and until they are each ordered to abide by the obligations to which they agreed when they executed the CNPR.

141.     As a direct result of Defendants' breaches, Kroll is suffering and will continue to suffer irreparable injury, including loss of business expectancies, customers, employees, its confidential information, and damage to goodwill, for which a remedy at law is inadequate, as Defendants each expressly acknowledged in the CNPR. Accordingly, Kroll is entitled to injunctive and equitable relief.

142.     In addition, as a result of Defendants' breaches of the CNPR, Kroll seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty)

143.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

144.     In their respective roles at Kroll, Demonte and Ackerman were each placed in a position of trust and confidence, and were expected to devote their full time to the management and promotion of Kroll's business interests.

145.     As a result of this special relationship, Demonte and Ackerman each owed certain fiduciary duties to Kroll including a duty of loyalty and honesty that required Defendants to refrain from activity and directly competing with Kroll, and a duty not to act in any way contrary to the interests of Kroll, including, but not limited to, a duty, while still employed with Kroll and being compensated by Kroll: (a) not to compete with Plaintiffs; (b) not to usurp corporate opportunities or divert business on behalf of another; (c) not to solicit Kroll's customers or employees, including the other Former Executives, on behalf of another; (d) not to orchestrate a mass exodus of

employees; (e) to help preserve Kroll's customer and employee relationships; (f) not to misuse, destroy or misappropriate the Company's confidential or trade secret information; (g) to return Company property, including data on Company-issued devices, upon cessation of employment; and (h) not to be deceitful to the Company.

146.     Notwithstanding these obligations and duties, and in violation thereof, Demonte and Ackerman each breached their fiduciary duty of loyalty and honesty to Kroll by, among other willful acts of misconduct, while still employed with the Company, and while having access to the Company's confidential, proprietary, and trade secret information: (a) working in concert with each other and Leonard to violate their contractual agreements to Kroll by soliciting each other to join a direct competitor; (b) working in concert with the each other and Leonard to divert the business of Kroll's customers to a competitor of the Company; (c) recruiting or soliciting other Kroll employees on behalf of Cybereason or to leave Kroll's employ; and (d) spreading misinformation about Kroll's capabilities.

147.     Demonte and Ackerman further breached their fiduciary duties to Kroll by destroying or failing to preserve and return Company Records and data on Company-issued devices in violation of Company policy, their contractual agreements, and legal preservation notices prior to returning them to Kroll.

148.     As a consequence of Defendants' respective breaches of their fiduciary duty of loyalty to the Company, Kroll has been injured and faces irreparable injury. Plaintiff is threatened with loss of business expectancies, losing customers and employees, further misuse of its confidential and trade secret information, and loss of goodwill in amounts which may be impossible to determine, unless Defendant is enjoined and restrained by order of this Court.

149.     In addition, as a consequence of Defendants' breaches of their respective fiduciary duties, Plaintiff seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Unfair Competition)

150.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

151.     Defendants, individually or in concert with each other, undertook the foregoing acts of misconduct, including soliciting customers to move their business away from Kroll, soliciting employees to leave Kroll's employ, spreading misinformation concerning Kroll's business with the intent to damage Kroll's brand and reputation in the industry, and destroying or failing to preserve Company Records as they were departing Kroll, all for their own self-interests and to gain an unfair competitive advantage in competing with Kroll.

152.     As a consequence of Defendants' unfair competition, Plaintiff has been injured and faces irreparable injury. Plaintiff is threatened with loss of business expectancies, losing customers and employees, further misuse of their confidential information, and loss of goodwill in amounts which are impossible to determine, unless Defendants are enjoined and restrained by order of this Court.

153.     In addition, as a result of Defendants' unfair competition, Plaintiff seeks actual, incidental, compensatory, punitive and consequential damages, along with its reasonable attorneys' fees and costs.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Tortious Interference With Prospective Economic Advantage)

154.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

155.    Until the events giving rise to this action, Kroll had maintained valid business relationships, or the expectancy of business relationships, with its customers and referral sources. Kroll had the reasonable expectation that these relationships and prospective relationships would continue and would not be unjustifiably disrupted.

156.    Defendants were and remain aware of these customer and business relationships and/or expectancies.

157.    Notwithstanding their knowledge of the existence of these relationships and expectancies, Defendants, individually or in concert with the other Former Executives, intentionally and unjustifiably interfered with these relationships by spreading misinformation and disparaging Kroll's business, and soliciting them to terminate their relationships with Kroll with the goal of moving their business away from Kroll.

158.    Defendants' intentional interference was willful, malicious, unjustified and accomplished through wrongful means, and was accomplished for an improper purpose, including to cause damage to Kroll and its lawful business.

159.    As a result of Defendants' tortious interference with Kroll's business relationships with its customers, Kroll will be threatened with loss of business expectancies, customers, employees, its trade secrets and goodwill in amounts which may be impossible to determine, unless Defendants are enjoined and restrained by order of the Court.

160.    In addition, Kroll seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

## AS AND FOR A FIFTH CAUSE OF ACTION
### (Tortious Interference With Contract)

161.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs of the Complaint as if fully set forth herein.

162.    Upon information and belief, as senior executives of the Company, Defendants are each fully aware that they each signed the CNPR and the restrictive covenants contained therein.

163.    Upon information and belief, as senior executives of the Company, Defendants are fully aware that Duncan also signed an agreement with Kroll that contains post-employment restrictive covenants prohibiting the misuse of confidential information, certain competition with Kroll, and the solicitation of customers and employees.

164.    Upon information and belief, as senior executives of the Company, Defendants are fully aware that Leonard also signed an agreement with Kroll that contains post-employment restrictive covenants against the misuse of confidential information and trade secrets and the solicitation of customers and employees.

165.    Despite having knowledge of the CNPR, Defendants each solicited and induced one another to violate their employee non-solicitation covenants without justification, by, among other things, conspiring to jointly leave Kroll in favor of employment with a direct competitor and together attempt to move the business of Kroll's customers to Cybereason.

166.    The wrongful actions described above were calculated to cause damage to Kroll in operating its lawful business, without right or justification on the part of Defendants.

167.    Upon information and belief, Defendants' tortious interference was malicious as it was accomplished through a coordinated scheme, aided by the other Former Executives and Cybereason, to violate their contractual duties to Kroll with the intent to decimate Kroll's Cyber Risk business by inducing one another and other employees to leave Kroll's employ, convert Kroll's customers to a direct competitor, spread misinformation about Kroll's business, and damage Kroll's goodwill and ability to compete.

168.    As a result of Defendants' tortious interference, Kroll has been injured and faces irreparable injury. Kroll is threatened with loss of business expectancies, losing customers,

employees, its competitive advantage and goodwill in amounts which may be impossible to determine, unless Defendants are permanently enjoined and restrained by order of this Court.

169.   In addition, Kroll seeks actual, incidental, compensatory, punitive and consequential damages, along with reasonable attorneys' fees and costs in an amount to be determined at trial.

**WHEREFORE**, Kroll respectfully requests that the Court enter Judgment in its favor and an Order against Defendants that grants the following relief:

1.   An injunction that:

    (a)   Preliminarily and permanently enjoins each Defendant from violating his restrictive covenants with Plaintiff;

    (b)   Preliminarily and prospectively enjoins Defendants, and all parties in active concert or participation with them, from accessing, using or disclosing any of Plaintiff's confidential, proprietary and trade secret information;

    (c)   Preliminarily and prospectively enjoins Defendants, and all parties in active concert or participation with them, for a period of twelve (12) months from the date of their last violation of the restrictive covenants in the CNPR, from directly or indirectly, engaging in or providing DFIR and Cyber Risk services in direct competition with Plaintiff;

    (d)   Preliminarily and prospectively enjoins Defendants, and all parties in active concert or participation with them, for a period of twelve (12) months from the date of their last violation of the restrictive covenants in the CNPR, from, directly or indirectly, soliciting or moving the business of any of Plaintiff's customers and business relations, and accepting business from any of Plaintiff's customers and business relations;

    (e)   Preliminarily and prospectively enjoins Defendants, and all parties in active concert or participation with them, for a period of twelve (12) months from the date of their last violation of the restrictive covenants in the CNPR, from directly or indirectly, soliciting or interfering with any of Kroll's employees, or encouraging or inducing them to leave Kroll's employ.

2.   Orders that Defendants, and all parties in active concert or participation with them, to return to Kroll all originals and copies of all files, devices, electronic media

and/or documents that contain or relate to Kroll's confidential, proprietary and trade secret information;

3.    Actual, incidental, compensatory, and consequential damages in an amount to be proven at trial that exceeds $75,000;

4.    Punitive damages in an amount to be proven at trial due to Defendants' willful and malicious conduct;

5.    Costs and expenses incurred herein, including reasonable attorneys' fees and interest; and

6.    All other relief as the Court may deem just, equitable and proper.

Dated:   August 8, 2024

Respectfully submitted,

SEYFARTH SHAW LLP


By:___/s/Renée Appel_____

Renée B. Appel (VBN 87721)
Seyfarth Shaw LLP
975 F Street NW
Washington, DC 20004
rappel@seyfarth.com
T: (202) 828-5371
F: (202) 828-5393

James S. Yu (*pro hac vice forthcoming*)
Matthew Catalano (*pro hac vice forthcoming*)
Seyfarth Shaw LLP
620 Eighth Avenue
32nd Floor
New York, NY 10018-14055371
jyu@seyfarth.com
mcatalano@seyfarth.com
T: (212) 218-5500
F: (212) 218-5526